IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ATI INDUSTRIAL AUTOMATION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09CV471 |
| | ) | |
| APPLIED ROBOTICS, INC., | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Applied Robotics, Inc.'s ("AR") Motion to Dismiss for Lack of Personal Jurisdiction, or Alternatively, to Transfer. Doc. # 24 Plaintiff ATI Industrial Automation, Inc. ("ATI") filed its Amended Complaint [Doc. # 20] on December 31, 2009, alleging that AR infringed on three of its patents. AR moved pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3) to dismiss the complaint, or alternatively, to transfer the case to the Northern District of New York pursuant to 28 U.S.C. § 1406(a). Subsequently, the Magistrate Judge granted the Plaintiff's motion for leave to conduct jurisdictional discovery. Plaintiffs, in addition to opposing the Defendant's motion to dismiss, "request" that if the case is indeed transferred, that it be transferred not to the Northern District of New York but instead to the District of South Carolina.[1] For the reasons that follow, AR's motion [Doc. # 24] is DENIED on all counts.

---

[1]ATI presented its alternative proposals in its Response to AR's instant Motion, rather than in a motion of its own. It characterized that course of action as "mov[ing] this Court" to transfer the case to the District of South Carolina or to allow jurisdictional discovery. Doc # 29 at 12, 17. The Local Rules of this Court require that each motion "be set out in a separate pleading." Local Rule 7.3(a).

I.

Plaintiff ATI is a North Carolina corporation with its principal place of business in Apex, North Carolina. Doc. # 20 ¶ 1. ATI "is in the business of designing, manufacturing, and selling robotic tool changers and other products." Id. ¶ 7. These devices provide "a mechanical interface between an industrial robot arm and a variety of tools, or end effectors, that may be attached to the robot arm to perform various tasks." Id. Relevant to this dispute, ATI holds three United States Patents related to robotic tool changers, Nos. 6,840,895 ("'895"), 7,027,893 ("'893"),[2] and 7,328,086 ("'086"). Id. ¶ 3; Doc. # 32, exs. 1-3. Defendant AR is a Delaware corporation with its principal place of business in Glenville, New York. Doc. # 20 ¶ 2; Doc. # 14 ¶ 3. AR "manufactures and sells equipment, such as collision sensors and tool changers, for industrial robots." Doc. # 26 ¶ 8.

ATI alleges that AR "has imported, used, sold, offered for sale, and/or has induced others to import, sell, or offer for sale, one or more tool changers infringing one or more claims" of the '895, the '893, and the '086 patents. Doc. # 20 ¶¶ 25, 29, 33. AR moves to dismiss ATI's suit for lack of personal jurisdiction and improper venue. Doc. # 24. In the alternative to dismissal for improper venue, AR seeks to transfer this action to the Northern District of New York. Doc. # 24.

---

[2] ATI refers to U.S. Patent No. 7,027,839 (rather than 7,027,893) in its Amended Complaint and Response, but such references appear to arise from a transposition error as to the last two digits of the patent number. Compare Doc. # 20 ¶ 3 (using terms "'893 patent" and "'839 patent" interchangeably) and Doc. # 29 at 2 (citing patent number "7,027,839" as ""893 patent'") with Doc # 32, ex. B. (apparent copy of U.S. Patent No. 7,027,893).

ATI has met its burden to show that AR maintained sufficient contacts with North Carolina to warrant an exercise of general personal jurisdiction and that venue is proper in the Middle District of North Carolina.

II.

AR first moves to dismiss for lack for personal jurisdiction under Fed. R. Civ. P. 12(b)(2).

A.

Questions of personal jurisdiction in patent infringement cases are "intimately related to substantive patent law," and are therefore governed by precedent set by the United States Court of Appeals for the Federal Circuit rather than that of the regional circuit in which the action arose. Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1994).

When a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff ultimately has the burden of proving the existence of personal jurisdiction by a preponderance of the evidence. Pieczenik v. Dyax Corp., 265 F.3d 1329, 1334 (Fed. Cir. 2001). If jurisdictional facts are disputed, the court can either hold a pretrial evidentiary hearing to resolve these questions or defer the resolution of the factual questions until trial. See 2 James W. Moore, Moore's Federal Practice § 12.31[5] ("Moore's"). If no pretrial evidentiary hearing is held to resolve disputed issues of jurisdictional fact, then the plaintiff must only make a prima facie case of personal jurisdiction in order to proceed to trial. See Electronics For Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003).

Here, while substantial jurisdictional discovery has been permitted, no formal evidentiary hearing has been conducted to resolve disputed issues of jurisdictional fact. As such, to proceed to trial, ATI must only make a prima facie case that the court has personal jurisdiction over AR. "A prima facie case is

established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict." Moore's § 12.31[5] (citing Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 855 (11th Cir. 1990)). In determining if a plaintiff has made the requisite showing, all factual disputes are to be resolved in the plaintiff's favor. Electronics For Imaging, 340 F.3d at 1349.

To determine whether a court has personal jurisdiction over an out-of-state defendant in a patent infringement case, it must first be determined whether the forum state's long arm statute permits service of process on the defendant. Autogenomics, Inc. v. Oxford Gene Tech. Ltd., 566 F.3d 1012, 1017 (Fed. Cir. 2009). If so, it must then be determined whether the exercise of jurisdiction over the defendant comports with due process. Id. The North Carolina long-arm statute has been construed "to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process." Dillon v. Numismatic Funding Corp., 291 N.C. 674, 676 (1977). Thus, the statutory and constitutional inquiries collapse into a single consideration: whether the exercise of jurisdiction over the defendant comports with due process.

For an exercise of personal jurisdiction to comport with due process, a defendant must first have "certain minimum contacts" with the forum. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). There are two theories through which minimum contacts can be found – "general or all-purpose jurisdiction, and specific or case-linked jurisdiction." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2851 (2011). "Adjudicatory authority is specific when the suit arises out of or relates to the defendant's contacts with the forum." Id. at 2853 (quotations and alterations omitted). Meanwhile, adjudicatory authority is general when a corporation's contacts with the forum are sufficient to "justify suit against it on causes of action arising from dealings

entirely distinct from those activities." Id. (quotations omitted).  Under either theory, an exercise of personal jurisdiction must also be found to be reasonable.

B.

ATI does not appear to assert that this suit arises out of AR's contacts with North Carolina, and indeed, there is no indication that any of the alleged infringement occurred within the state.  The question is therefore whether North Carolina has general, all-purpose jurisdiction over AR.

Plaintiffs bear a "higher burden" when establishing general jurisdiction than they do when establishing specific jurisdiction.  Avocent Huntsville Corp. v. Aten Int'l Co., Ltd., 552 F.3d 1324, 1330 (Fed. Cir. 2008).  "Sporadic and insubstantial contacts with the forum state . . . are not sufficient to establish general jurisdiction."  Campbell Pet Co. v. Miale, 542 F.3d 879, 884 (Fed. Cir. 2008).  Further, "continuous activity of some sorts within a state is not enough . . . the continuous corporate operations within a state must be so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."  International Shoe, 326 U.S. at 318.  In essence, for general jurisdiction to exist over an out-of-state corporation, the corporation's affiliations to the forum state must be "so 'continuous and systematic' as to render them essentially at home in the forum State."  Goodyear Dunlop, 131 S.Ct. at 2851 (citing International Shoe, 326 U.S. at 317).  "Neither the United States Supreme Court nor the Federal Circuit has outlined a specific test to follow when analyzing whether a defendant's activities within a state are 'continuous and systematic.'  Instead, a court must look at the facts of each case to make such a determination."  LSI Indus. Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000). In determining whether an out-of-state corporation has sufficient contacts with a forum to warrant an exercise of general jurisdiction,

courts consider factors including: "(1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation." Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1533 (10th Cir. 1996) (cited with approval in Delta Sys., Inc. v. Indak Mfg. Corp., 4 F. App'x 857 (Fed. Cir. 2001) (unpublished)).

The record shows that AR is not registered to do business in North Carolina and maintains no offices, employees, or operations in the state. Nevertheless, ATI asserts that general jurisdiction is warranted based AR's other ties to North Carolina, including its active attempts to pursue and cultivate business contacts within North Carolina and the resulting regular economic relationships it maintains with North Carolina entities. Considering the materials produced in jurisdictional discovery, an exercise of general jurisdiction is warranted.

First, it is important to note that AR's ties to North Carolina are not accidental. There is ample evidence that AR's national advertisements regularly reached North Carolina. See, e.g., Doc. # 50, ex. 15 at 10; Doc. # 50, ex. 13 at 5, 7. More importantly, AR's employees actively solicited business with North Carolina entities. See, e.g. Doc. # 51 ¶ 4 (stating that there were 1,821 unique e-mail communications "in AR's North Carolina e-mails" from 2005 to 2009); Doc. # 51, exs. 11-14 (discussing phone calls to North Carolina customers). As a component of this active solicitation, AR regularly sent sales agents to the state to target specific sales prospects. See Doc. # 50, ex. 9 (listing trips made to North Carolina by AR employees). While such contacts are not in isolation

-6-

sufficient to support an exercise of general jurisdiction, they nevertheless speak to the systematic and continuous nature of AR's contacts to the forum. See Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1174 (9th Cir. 2006) (finding that an exercise of general jurisdiction was warranted in part based on the fact that defendant's sales into the forum resulted from a sustained, long term advertising effort); Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 573 (2nd Cir. 1996) (finding that defendant's directed advertisements and deliberate targeting of forum entities as sales prospects supported an exercise of general jurisdiction).

AR's targeting of North Carolina customers was not in vain. AR's sales records indicate that from 2005 to 2009, it made over 649 sales to 43 different entities in which "the bill state, the sold state, and/or the ship state is listed as North Carolina," generating over a million dollars in revenue. Doc. # 51 ¶ 7; Doc. # 55. AR argues that its sales to North Carolina entities merit little weight since, in fiscal year 2009, they were only 1.2% of AR's total sales.[3] See Doc. # 42 at 2-3. However, just as it would be inappropriate to permit an exercise of personal jurisdiction solely on the presence of sales into the forum, see Goodyear Dunlop, 131 S.Ct. at 2857 n.6 ("Even regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales."), it would likewise be inappropriate to entirely disregard a defendant's sales into the forum simply because they only generated a small percentage of the defendant's total revenue. Instead, the inquiry should focus on whether the defendant's activities were substantial, continuous, and systematic based on "the 'economic reality' of the defendant's activities in the forum state." Ashbury Int'l Group, Inc. v.

---

[3] It is unclear what percentage of AR's total sales were tied to North Carolina in other fiscal years.

Cadex Defence, Inc., No. 11-CV-79, 2012 WL 4325183, at *4 (W.D. Va. Sept. 20, 2012) (quoting Tuazon, 433 F.3d at 1172 (9th Cir.2006)); see also LSI Indus., 232 F.3d at 1375 (holding that an exercise of general jurisdiction was warranted based on the defendant's sales into the forum and broad distributorship network in the forum).

It is true that the Federal Circuit has found that sales to forum entities amounting to only "two percent of the defendants' total sales" did not warrant an exercise of general jurisdiction. Campbell Pet Co., 542 F.3d at 884. However, the significance of those sales was discounted not only because of their small value relative to the defendants' total revenue, but also because they consisted of only twelve sales spread over four of the previous eight years, grossing only $14,000. See id. This more holistic approach understandably results in courts reaching different conclusions as to the propriety of general jurisdiction despite addressing businesses who made similar percentages of their sales to entities within the forum. Compare Stairmaster Sports/Med. Products, Inc. v. Pac. Fitness Corp., 916 F. Supp. 1049, 1053 (W.D. Wash. 1994) aff'd, 78 F.3d 602 (Fed. Cir. 1996) (finding sales to forum entities, constituting approximately 3% of the defendant's total sales volume, did not warrant general jurisdiction when they were made through independent distributors and not by the defendant itself); with Southern Pride, Inc. v. Turbo Tek Enterprises, Inc., 117 F.R.D. 566, 568 (M.D.N.C. 1987) (finding sales to forum entities, constituting approximately 3.6% of defendant's total sales volume, supported an exercised of general jurisdiction when the defendant operated the mail order business responsible for the sales and employed a sales representative residing in the forum).

AR's sales are therefore relevant not simply for the aggregate revenue they generate, but instead for what they reveal about the relationships AR maintains

with North Carolina. And although some may have been isolated, one-time transactions, others appear to have been made incident to continuous, long-term relationships with North Carolina consumers. See, e.g. Doc. # 55 at 3-16 (listing over $300,000 in sales to a single customer, spread over hundreds of regular transactions throughout the discovery period); id. at 23-31 (listing over $50,000 in sales to a single customer, spread over dozens of regular transactions throughout the discovery period). The accuracy of this view is reinforced by other evidence of the depth of AR's relationship to its North Carolina consumers. For example, AR employees went to North Carolina on multi-day trips to meet customers, provide technical support, and perform maintenance at customers' facilities.[4] See Doc. # 17, ex. 5 ¶ 3; Doc. # 50, ex. 20; Doc. # 50, ex. 9. Employees would visit certain important clients whenever they were in the region. See Doc. # 50, ex. 2 at 41. AR regularly received goods back from North Carolina customers for replacement or repair. See Doc. # 51 ¶ 23; Doc. # 50, ex. 2 at 20-22. When viewing AR's sales together with the whole record, it is clear that many were not sporadic transactions of marginal significance, but instead the carefully-tended

---

[4]AR produced a list documenting thirty trips made by its employees to North Carolina (the "Trip List"). See Doc. # 50, ex. 9. It treats this list as comprehensive. See Doc. # 42 at 6 (referencing the "the 30 trips to North Carolina made by AR employees"). However, expense reports for AR's employee Steve Listing reveal that at least two of his trips to North Carolina were not included on the Trip List. Compare id. at 7 (reporting a trip from Aug. 15 to Aug. 19, 2005 that included stops in Kings Mountain, NC, Belmont, NC, and Charlotte, NC) and id. at 11-12 (reporting a trip from Aug. 20 to Aug 24, 2006 that included a stop in Hickory, NC) with Doc. # 50, ex. 9 (not listing any North Carolina trip during August of 2005 or 2006). The record does not include similar expense reports for other AR employees. As such, while the record demonstrates that at least thirty-two trips were taken to North Carolina over the discovery period, it does not foreclose the possibility that there were additional, undisclosed trips.

Listing's expense reports also reveal that the Trip List understates the duration of at least one trip. Compare Doc. # 27, ex. 2 at 26 (describing expenses incurred by Steve Listing in North Carolina from Jan. 3 to Jan. 7, 2008) with Doc. # 50, ex. 9 (listing a trip taken by Steve Listing from Jan. 3 to Jan. 5, 2008).

fruits of AR's active efforts to cultivate long-term business relationships within the state.

ATI also highlights the fact that AR sold approximately $500,000 worth of goods to a non-forum product integrator that ultimately installed the goods in a Cleveland, NC facility.[5] See Doc. # 50, ex. 2 at 5. ATI notes that this alone is a substantial sale for the company. It also notes that since this sale was not included on the list of AR's sales to North Carolina entities, discovery did not foreclose the possibility that additional undisclosed sales were made to other non-forum intermediaries that ultimately directed AR's products to North Carolina.

As noted by AR, in determining if an exercise of general jurisdiction is warranted, a defendant's sale of a product to an independent, non-forum entity is not a relevant contact simply because the non-forum entity ended up using or selling the product inside the forum. See Goodyear Dunlop, 131 S.Ct. at 2855 (state court erred in applying the "stream of commerce" theory to general jurisdiction analysis). However, that does not mean that such sales cannot be jurisdictionally relevant when their circumstances reveal something about the defendant's relationship to the forum. In this case, all evidence indicates that AR was aware at the time of the 2005 sale that the products were ultimately destined for Freightliner, LLC's North Carolina facility. More importantly, the sale was also only one component of an independent relationship AR maintained with the North Carolina end-user: an AR employee worked on product planning and design on-site with Freightliner, see Doc. # 17, ex. 6 ¶ 5; AR employees periodically visited Freightliner's North Carolina facility to maintain their relationship, to provide technical support, and to remove and replace equipment, see id.; Doc. # 27; Doc.

---

[5] Seventy to eighty percent of AR's sales were made to product integrators, not end-users. Doc. # 50, ex. 2 at 11.

-10-

# 50, ex. 2 at 52-54; Doc. # 50, ex. 20; further, throughout the discovery period, AR regularly made smaller sales directly to Freightliner, including a 2007 sale of over $100,000 in replacement parts, see Doc. # 55 at 23-24. While the sale may have been <u>more</u> probative of AR's continuous and systematic contacts to North Carolina if AR had handled it entirely on its own, it is not irrelevant simply because it was made through an out-of-state third party. The large 2005 sale to the non-forum entity is therefore evidence of the depth and importance of AR's own ties to the North Carolina end-user. The sale also further demonstrates that the full nature and economic significance of AR's ties to North Carolina cannot be captured by looking solely at sales made directly to the state.

Although AR does not maintain a permanent physical presence in North Carolina, it does maintain substantial, continuous, and systematic contacts to the state. These contacts are sufficient to warrant an exercise of personal jurisdiction over claims unrelated to those contacts.[6]

C.

After a plaintiff establishes sufficient minimum contacts to support an exercise of personal jurisidiction "it becomes the defendants' burden to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Elecs. for Imaging, Inc., 340 F.3d at 1351 (quoting Burger King, 471 U.S. at 477). "The reasonableness inquiry encompasses

---

[6] ATI cites a number of additional contacts as supporting an exercise of general jurisdiction. For example, it references AR's semi-interactive website, along with records demonstrating that North Carolina users accessed the website and utilized its interactive features. See Doc. # 50, ex. 2 at 32; Doc. # 50, ex. 17; Doc. # 51, ex. 18; Doc. # 51, ex. 19. It likewise highlights purchases made by AR from North Carolina vendors, totaling approximately $150,000 in volume from 2005 to 2009. See Doc. # 51 ¶ 24; Doc. # 58.

Disposition of this motion does not turn on these contacts, and they appear far more incidental than those discussed above. However, they do add some additional depth to the relationship AR maintained with North Carolina.

-11-

factors including (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." Id. (citing Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 113 (1987)). Finding jurisdiction unreasonable is "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." Beverly Hills Fan Co., 21 F.3d at 1568.

Although AR's arguments were not focused on North Carolina being an unreasonable forum, portions of its arguments relating to minimum contacts and transfer of venue demonstrate that litigating this case in North Carolina would present something of a burden for the corporation. However, these inconveniences do not present the type of circumstances in which an exercise of personal jurisdiction would be unreasonable. ATI is a North Carolina corporation, and a forum state has "an interest in providing a convenient forum" for its citizens. Patent Rights Prot. Group, LLC v. Video Gaming Technologies, Inc., 603 F.3d 1364, 1370 (Fed. Cir. 2010). Further, the substantial number of admitted trips by AR employees to North Carolina "suggest that the company does not face a particularly onerous burden in defending itself in this state." Ashbury Int'l Group, 2012 WL 4325183, at *7 (citing Patent Rights, 603 F.3d at 1371).

This is not one of those rare situations in which an exercise of personal jurisdiction would be unreasonable. As such, an exercise of general personal jurisdiction over AR is warranted.

III.

AR also moves to dismiss ATI's complaint for improper venue under Fed. R. Civ. P. 12(b)(3). In the alternative to dismissal for improper venue, AR seeks to transfer this action to the Northern District of New York pursuant to 28 U.S.C. § 1406(a).

A.

"When an objection to venue has been raised under Rule 12(b)(3), the burden lies with the plaintiff to establish that venue is proper in the judicial district in which the plaintiff has brought the action." Plant Genetic Sys., N.V. v. Ciba Seeds, 933 F. Supp. 519, 526 (M.D.N.C. 1996) (citing Bartholomew v. Virginia Chiropractors Ass'n, Inc., 612 F.2d 812, 817 (4th Cir.1979)). When considering a motion to dismiss for improper venue, the court must draw all reasonable inferences and resolve all factual conflicts in the plaintiff's favor. See Mercam, Inc. v. Portlyn, Inc., No. 6-CV-185, 2007 WL 152121, at *5 (W.D.N.C. Jan. 17, 2007); Moore's § 12.32[4].

Venue in patent infringement cases is governed by 28 U.S.C. § 1400(b), which establishes that "any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Since ATI does not allege that AR committed any acts of infringement in North Carolina, venue is proper in any district in which AR "resides."

Residency for venue purposes is defined by 28 U.S.C. § 1391. VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574 (Fed. Cir. 1990). When determining the residency of a corporation in a state with multiple judicial districts, a corporation "shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district

-13-

were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts." 28 U.S.C. § 1391(c) (current version at 28 U.S.C. § 1391(d)); see also VE Holding Corp., 917 F.2d at 1578 (When "a defendant corporation is amendable to federal jurisdiction in a state having several judicial districts," then the "second sentence of § 1391 subsection (c)" applies to "prescribe which of them shall be the proper venue.").

AR primarily argues that its contacts to the Middle District of North Carolina would be insufficient to warrant an exercise of general jurisdiction if the Middle District were a separate state. It is not necessary to answer this question given that the record, drawing all reasonable inferences in favor of the Plaintiff, demonstrates that the AR has its "most significant contacts" with the Middle District of North Carolina.[7]

---

[7] The phrase "most significant contacts" does not appear to have received significant interpretation, and is "confusingly foreign to the analysis of personal jurisdiction." John B. Oakley, Recent Statutory Changes in the Law of Federal Jurisdiction and Venue: The Judicial Improvements Acts of 1988 and 1990, 24 U.C. Davis L. Rev. 735, 773 (1991); see also, id. at n.146 (discussing how "significant contacts is a term of art within analysis of the due process regulation of state court choice of law that differs fundamentally from the 'minimum contacts' analysis of personal jurisdiction"). However, it is self evident that, in a multi-district state, if a defendant has contacts with any individual district sufficient to warrant an independent exercise of general personal jurisdiction, then that defendant likewise has contacts sufficient to warrant an independent exercise of general jurisdiction in whichever of that state's districts within which it has "the most significant contacts." As such, if an exercise of general jurisdiction is warranted in a multi-district state, then venue would never be improper in the district within which the defendant has its most significant contacts. The result of the statute's peculiar wording is therefore that venue in a multi-district state is appropriate in both 1) the district within which the corporate defendant has its "most significant contacts"; and 2) any other district in the state within which the corporate defendant maintains sufficient contacts to subject it to personal jurisdiction if that district were a separate state. If AR has its "most significant contacts" with the Middle District of North Carolina, it would therefore not be necessary to determine if those contacts are sufficient to independently warrant an exercise of personal jurisdiction.

-14-

B.

The bulk of the record seems to have been developed with the question of personal jurisdiction in mind–not venue. However, there are a few pieces of information within the record that inform the venue inquiry. Almost all of this evidence supports a finding that AR's most significant contacts are with the Middle District.

For example, although the location of many of AR's North Carolina customers cannot be determined, the record does demonstrate that sales made to GKN Driveline North America ("GKN") were made to the Middle District. See Doc. # 17 ex. 6 (identifying GKN facility as being located in Sanford, NC). GKN was AR's largest and most regular North Carolina customer during the discovery period. See Doc. # 50, ex. 2 at 41 (identifying GKN as AR's largest North Carolina customer); Doc. # 55 at 3-16 (listing consistent, large volume sales to GKN throughout the discovery period). Further, as noted above, Freightliner, Inc. maintained a facility in Cleveland, NC. This is also within the Middle District and was the destination for some of AR's largest sales to Freightliner. See Doc. # 17 ex. 6 (identifying Freightliner's Cleveland, NC facility as the ultimate recipient of both AR's large sale to the non-forum product integrator and AR's direct sale of over $100,000 in replacement parts). The scale of these two relationships is consistent with the fact that in fiscal year 2009, over 90% of AR's North Carolina sales volume came from the Middle District. See Doc. # 16 ¶ 13. Although discovery did not produce district-specific information for other fiscal years, on this record it is reasonable to infer that the bulk of AR's North Carolina sales were consistently made to the Middle District. See also Doc. # 17, ex. 5 (naming the locations of several of AR's smaller North Carolina customers, several of which were also located within the Middle District).

-15-

Case 1:09-cv-00471-NCT-LPA   Document 85   Filed 03/19/13   Page 15 of 18

Records of AR employees' trips to North Carolina also suggest that the majority of its North Carolina relationships were with Middle District customers. The previously discussed Trip List indicates that three of its thirty trips were to "Greensboro." A review of AR employee Steve Listing's expense reports reveals that at least three of his trips that are not associated with a Middle District location on the Trip List actually included stops within the Middle District.[8] Both the Trip List and his expense reports also reveal that Mr. Listing frequently visited Statesville, a Western District community neighboring Freightliner's Cleveland facility, and that he frequently met with Freightliner officials on these visits. See, e.g. Doc. # 27, ex. 2 at 18 (identifying a dinner with a Freightliner engineer in Statesville, NC, on a trip listed as only being to Charlotte). Considering this together with the fact that AR's CEO stated that Mr. Listing would visit Freightliner as a matter of practice when making sales calls to the region, see Doc. # 50, ex.

---

[8] Citing the Trip List, AR claims that "only 3 of the 30 trips to North Carolina made by AR employees over a span of five years were into this district." Doc. # 42 at 6 (citing Doc. # 50, ex. 9). This statement does not appear to be supported by the record. A cursory examination of AR Mr. Listing's expense reports reveals that the Trip List's "cities" column does not name every city the traveling employee visited, and that these unlisted stops were often in the Middle District. Compare Doc. # 50, ex. 9 line 2, 4, and 7 (describing Listing's trips to "Raleigh" from June 27 to July 1, 2005; to "Raleigh" from Oct. 17 to 21, 2005; and to "Charlotte" from Dec. 19 to 22, 2005) with Doc. # 27, ex. 2 at 4-5 (June 27 trip was to Durham, NC and included a dinner purchased in Sanford, NC); id. at 8-9 (Oct. 17 trip included a dinner purchased in Greensboro, NC); and id. at 10-11 (Dec. 19 trip included a lunch purchased in Cleveland, NC).

No entry on the Trip List names Sanford or Cleveland as a visited city. Since it was well known that two of AR's largest North Carolina customers had facilities in Sanford and Cleveland, and since it was also well known, and frequently recognized, that AR employees had visited these facilities, it should have been immediately apparent to anyone familiar with this case that the Trip List's "cities" column did not exhaustively name every place visited on the trips it describes.

2 at 41, it seems reasonable to infer that many of these trips likewise included a stop at Freightliners nearby Middle District facility.[9]

Including those trips related to the modular update at Freightliner's Cleveland facility, see supra at n.9, at least ten of the Trip List's thirty trips almost certainly included stops within the Middle District. An even larger number of Mr. Listing's trips related to business relationships maintained with Middle District entities. While the record does not include expense reports detailing trips made by other employees, it is reasonable to infer that many of these also included unlisted Middle District destinations or involved business related to Middle District customers.

As such, AR employees' visits to North Carolina likewise support a finding that AR had its "most significant contacts" with the Middle District of North Carolina. Considering these visits together with available sales records, ATI has met its burden to show that AR has its "most significant contacts" in the Middle

---

[9] Mr. Listing originally averred that he visited Cleveland monthly and Sanford quarterly. See Doc. # 17, ex. 6 ¶¶ 3, 5. However, after viewing the expense reports from which the Trip List was formed, he stated that he had actually only traveled into the Middle District five times over the course of his entire employment, see Doc. # 27 ¶ 10. This statement also appears to be inconsistent with other materials produced in discovery.

It is true that a review of Mr. Listing's expense reports reveals only five trips reporting expenses at Middle District locations. However, two trips which only report expenses in Statesville were made in order to perform a "modular update" at Freightliner's Cleveland facility. There is ample evidence that Mr. Listing visited the Cleveland facility on these two trips. See Doc. # 50, ex. 20 (e-mail from Mr. Listing stating that "Joe and I will remove all units and ship" on the first modular update trip, and that "they will have a tech there Jan. 4&5 so that we can install updated modules."); Doc. # 27, ex. 2 (second trip's expense report listing the "Purpose of Trip" as relating to a Freightliner "device net install and holiday start up," and listing two purchases of "Dounuts sic for plant"). Even if Mr. Listing did not visit the Cleveland facility on any other trip he made to Statesville–which seems unlikely–including the two trips associated with the modular update increases his total number of trips into the Middle District to seven.

District of North Carolina.  Venue is therefore appropriate under 28 U.S.C. §§ 1400(b) and 1391.

IV.

Since an exercise of general personal jurisdiction is warranted and reasonable, and since venue is proper in the Middle District of North Carolina, AR's motion [Doc. # 24] is DENIED on all counts.

This, the 19th day of March, 2013.

          /s/   N. Carlton Tilley, Jr.
          Senior United States District Judge